WYNNE, Supervisor of Permits, et al. v. EUREKA CEREAL BEVERAGE CO., Inc.

No. 4745.

Circuit Court of Appeals, Third Circuit.

Feb. 20, 1932.

Phillip Forman, U. S. Atty., of Trenton, N. J., and Edward C. Dougherty and Richard Hay Woolsey, both of Philadelphia, Pa., for appellants.

Harold Simandl, of Newark, N. J., for appellee.

Before WOOLLEY and DAVIS, Circuit Judges, and DICKINSON, District Judge.

WOOLLEY, Circuit Judge.

On the bill of the Beverage Company to review the action of the Supervisor of Permits in refusing it a permit, the court held that his decision was not supported by evidence and accordingly ordered him to issue a permit. The Supervisor appealed on eleven grounds, of which only four call for discussion. The other seven are really conclusions from these four.

(1) The Supervisor charges error to the court in failing to hold the applicant's method of doing business entirely for cash might be considered by the Supervisor as an indication of bad faith on the part of the applicant.

We think, under Bernstein v. Doran (C. C. A.) 33 F.(2d) 897 and National Grain Yeast Corporation v. Mitchell (C. C. A.) 51 F.(2d) 500, the manner in which a permittee does business may properly be "considered" and, under some circumstances, may be an ingredient in the evidence of bad faith. But, standing alone, the mere doing business for cash instead of by check or on credit does not constitute evidence of bad faith and therefore evidence to support a refusal of a permit. The applicant's story of doing business exclusively for cash sounds honest. Business done in this manner may be honest or dishonest. There is no evidence that in this case it was dishonest in the sense of violating the law.

(2) The Supervisor next charges error to the court in holding the failure of the applicant to produce its treasurer for examination could not be considered by the Supervisor as an indication of bad faith on the part of the applicant.

The court did not so hold. The fact is the court itself considered the matter and doubtless would have allowed the Supervisor to consider it, but held that, in the circumstances, it would not alone support the Supervisor's decision. The treasurer was indeed a hazy figure. He may have been an honest dummy, or he may have been a crooked backer. There was evidence that he was the former and no evidence that he was the latter; nor was there evidence that the active members of the company were lax in their efforts to find and produce him.

(3) The third error charged to the court was in failing to hold that the real parties in interest in the application had not been disclosed.

This arises out of a loan transaction which, as explained, was very different from the loan transaction in National Grain Yeast Corporation v. Mitchell, supra. By itself, this does not constitute evidence sufficient to sustain the Supervisor's order.

Having held that each of these unrelated things would not alone sustain the order, we are of opinion that, without relation to anything else, they together do not sustain it.

We have been more concerned about the fourth question in reference to a matter which, if established by the evidence as broadly as the Supervisor has stated it in his brief, would by itself sustain the order.

(4) The question in the words of the Supervisor is: Whether or not the court "erred in failing to hold that the possession by the applicant at all times of a large amount of carbonated high powered beer might be considered as an indication of bad faith."

It is carbonic gas that gives life to beer. Carbonated low powered beer of the prescribed alcoholic content may be lawfully sold. High powered beer, whether carbonated or not, cannot be lawfully sold. To be salable, lawfully or unlawfully, beer must be palatable. To make it palatable, beer of either power must be carbonated. If the only purpose of carbonating high powered beer were to make it salable, the presence in a brewery of a large quantity of carbonated high powered beer would carry its own implication and could be considered as evidence of an intended diversion into unlawful channels. But the facts on which this question is predicated give it a different color. They concern (1) the quantity of high powered beer and (2) the quantity of carbonated high powered beer which the brewery normally kept on hand, and their uses. On the first point the Supervisor says in his brief: "Contrary to the usual practice of legitimate beverage plants, the applicant keeps on hand in the brewery a very large amount of high powered beer and a very small quantity of dealcoholized cereal beverage."

That is true. The plaintiff admitted that it kept on hand between 6,000 and 6,500 barrels of beer, rendered high powered in nor-

mal process of manufacture, explaining, however, that keeping this large quantity—about three-quarters of the brewery's capacity—was necessary in order properly to age it and thereby improve its quality. There is nothing in the brief and we find nothing in the record to refute this explanation.

But, continuing, the Supervisor says: "Moreover, all of the high powered beer is carbonated prior to dealcoholization. This is not in accord with the usual method of legitimate breweries, and is a practice lending itself readily to diversion."

The first sentence of this statement is true, but falls short of stating all the facts. The brewmaster testified that not all of the high powered beer on hand is carbonated, evidently meaning not fully carbonated; that only about ten per. cent.—600 or 700 barrels—of beer of this grade is carbonated; that this quantity of carbonated high powered beer, being in correct proportion to the beer remaining which is to be dealcoholized, is used for blending with dealcoholized beer from which all alcohol has been boiled out and all gas expelled; the blend of the carbonated high powered beer being used to restore to the dealcoholized beer alcohol in the lawful percentage and to supply a quantity of carbonic gas and improve the flavor. This may not be the "usual" method practiced in breweries, but that it is an impracticable method or was not the method actually pursued was not proved. Moreover, if the Supervisor's statement that "all high powered beer (in the plaintiff's brewery) is carbonated prior to dealcoholization" means, as we understood it at the argument, that all the high powered beer was carbonated to the extent of making it palatable and salable and therefore divertible, it is contradicted by one of the Supervisor's own witnesses. An inspector connected with the Bureau of Industrial Alcohol testified that the high powered beer to which the Supervisor referred "was not fully carbonated," by which we understand he meant that it was not carbonated to the extent of making it a finished and commercial product. In reference to the practice of giving high powered beer a slight treatment of the natural carbonic gas (which arises from the brew) before dealcoholization, the witness testified there was a difference of opinion among the "authorities" as to whether the flavor would, as the brewmaster contended, thereby be accentuated and improved. This was more of a dissertation or discussion by two experts on good brewing practice than evidence of intended diversion to unlawful uses. Anyhow, it takes away

the point of the Supervisor's argument and leaves his decision without support.

The decree is affirmed.