WYNNE, Supervisor of Permits, et al. v. EAGLE BREWING CO., Inc.

No. 4678.

Circuit Court of Appeals, Third Circuit.

April 27, 1932.

Edward W. Wells, U. S. Atty., Edward Dougherty, and Richard H. Woolsey, Sp. Atty., all of Philadelphia, Pa., for appellants.

N. S. Winnet, of Philadelphia, Pa., for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge.

This is an appeal from a decree of the district court which reversed the order of the appellants refusing a permit, and directed them to issue a permit to the appellee for the year 1931.

The Eagle Brewing Company was engaged in the brewery business long before the passage of the Eighteenth Amendment. Since the amendment, it has had a federal permit. Its application for the renewal of its permit for 1931 was refused on the ground of the applicant's unfitness, without, however, any statement of what constituted the unfitness. A hearing was demanded. The supervisor of permits was requested by the applicant to produce at the hearing the twenty-eight agents who had inspected the brewery premises during 1930 to show that the operation of the plant had been continually under the supervision of the supervisor and his agents and that they had never seen anything wrong at the plant upon which the conclusion of unfitness could be predicated. One of the agents testified that he had personally made about one hundred twenty-five inspections, and had also received reports of the inspections of other agents who were under his direction, and that he had neither found nor heard of anything wrong in connection with the brewery.

The testimony on which the supervisor based his action and which he thought showed unfitness of the applicant may be reduced to two main propositions:

■ 1. The brewery company kept two prohibition agents out of the racking room on October 3, 1930, for ten minutes. This in fact was the real charge on which the supervisor principally relied.

When the agents drove up to the brewery premises, they saw two men. One had on working clothes, and the other was rather well dressed. Who this other man was and whether or not he was connected with the brewery is not known. The agents testified that when their car stopped across the street from the brewery, the well dressed man went down the street, and the working man was standing just outside the office door, and "he went back through the garage and out through that areaway and that's the last I saw of him"; "we went right through the front office, the adjoining office, the garage and across the open court and tried to open the door into the brewery proper and found it locked." From the time they drove up and started to cross the street until they reached this door which they found locked, they had not seen any one except the two men mentioned above. There was no one in the engine room, the door of which they found locked. The agents guessed that it was ten minutes before the door was opened by a man who stood to one side and let them pass. But it was "admitted that a couple of walls intervened between the door they were knocking at and the racking room where the men were, and that the men could not have heard the knocking."

When the agents reached the racking room, practically all of the brewery force was there, the floor was wet with suds, water was running through the hose, and the drain in an adjoining room was full of suds.

The agents arrived at the brewery about ten minutes after eight o'clock in the morning. The testimony shows that all the men were in the racking room for the purpose of cleaning up the room for the day's work, and, when cleaning and scrubbing the racking room of a brewery, suds are usually produced on the floor. The agents testified

that they had seen just this same condition in breweries where legitimate business was admittedly being carried on.

The evidence in this case, differing materially from the evidence in Burns v. Doran, Prohibition Commissioner (C. C. A.) 37 F.(2d) 484, merely raises a suspicion, and cannot be considered competent evidence on which to base a conclusion that beer of an unlawful alcoholic content had been diverted.

The agents immediately made a check of the beer in the entire brewery, examined the condition of the vats, checked the official forms, and all the reports made by the company. There was no shortage. These records were made only the day before. If beer had disappeared, it must have been stored in barrels or been poured down the drain. The barrels were dry, and there is no evidence that beer had been poured down the drain.

■■ 2. The brewery conducted its business improperly, in that it failed to keep records, the addresses of its customers, and did its business in cash, so that the disposition of its beer could not be traced.

The failure to keep records or books showing the exact amount of business done and the customers to whom its beer was sold may not be an ideal method of conducting business and may be suspicious. But a permit may not be refused on mere suspicion that the permittee has violated, or has not in good faith conformed to the provisions of, the National Prohibition Act (27 USCA), or that he has not conducted his business in accordance with any well-recognized business system.

The particular method by which a person conducts his business depends upon many things, and the adoption of one method rather than another is immaterial, unless there is competent proof to show a violation of or the lack of good faith in conforming to the provisions of the act.

The failure to keep a record of the names and addresses of its customers by the applicant may or may not be a cause for refusing a permit. If there is competent evidence to show that it was for the purpose of covering up illegal transactions, it does constitute a cause. If, on the other hand, the evidence does not disclose such purpose, and at most is merely suspicious,

it does not justify such action. The permittee says that the method was adopted for its own protection to prevent a charge of violating the act as a result of the change of its product by the vendee, or the mistaking of another's illegal product for its own. This may or may not be true; but there is no competent evidence to the contrary.

With reference to the charge of doing business for cash rather than on credit or by check, in the case of Wynne et al. v. Eureka Cereal Beverage Co., 56 F.(2d) 516, 517, we said:

"(1) The Supervisor charges error to the court in failing to hold the applicant's method of doing business entirely for cash might be considered by the Supervisor as an indication of bad faith on the part of the applicant.

"We think, under Bernstein v. Doran (C. C. A.) 33 F.(2d) 897 and National Grain Yeast Corporation v. Mitchell (C. C. A.) 51 F.(2d) 500, the manner in which a permittee does business may properly be 'considered' and, under some circumstances, may be an ingredient in the evidence of bad faith. But, standing alone, the mere doing business for cash instead of by check or on credit does not constitute evidence of bad faith and therefore evidence to support a refusal of a permit. The applicant's story of doing business exclusively for cash sounds honest. Business done in this manner may be honest or dishonest. There is no evidence that in this case it was dishonest in the sense of violating the law."

What we said there is applicable here.

The supervisor did not have any competent evidence on which to refuse the renewal of the permit. He mainly relied on his charge of diversion of beer on October 3, 1930, but he had no evidence, as distinguished from suspicion, to substantiate it. If he had, and what he had was discovered that day, he should have proceeded immediately thereafter to revoke the permit, and we are persuaded that such a capable official as the supervisor is, would have done so. But the evidence shows rather clearly that there was no diversion. As above stated, all that he had on which to base his refusal to renew the permit was suspicion, and this did not justify his action. Therefore the decree of the District Court is affirmed.